IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEFFREY D. FORTER,

Plaintiff,

v.

STUART YOUNG, et al.,

Defendants.

Case No. 6:18-cv-01171-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

Plaintiff Jeffrey D. Forter is a religious follower of Apostolic Christian Identity ("ACI") and the primary Theologian of the Restored Assembly of Elohim ("RAOE"), an independent ACI assembly.[1] Plaintiff currently receives a kosher diet that is largely vegetarian as a religious accommodation from the Oregon Department of Corrections ("ODOC"). Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that ODOC employees Stuart Young, Dennis Holmes, and Heidi Steward violated his constitutional rights by failing to provide a kosher diet that is meat inclusive. Plaintiff brings this action against all defendants in their individual and official capacities.

[1] Plaintiff refers to his faith as the "Church of Jesus Christ Christian" ("CJCC") throughout the grievance process, yet almost all his theological documents are specific to the RAOE. This Court uses the terms ACI, CJCC, and RAOE interchangeably based on the assumption that plaintiff's facts and arguments regarding the CJCC apply to the RAOE and vice versa. The Court understands, however, that there are doctrinal and sectarian differences between the CJCC and the RAOE.

Now before the Court are the parties' cross-motions for summary judgment. All parties have consented to allow a Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, plaintiff's partial motion for summary judgment is denied, defendants' cross-motion for summary judgment is granted, and this case is dismissed.

## BACKGROUND

### I. Plaintiff's Religious Background and Dietary Requirements

ACI is "a particular branch of Christianity" that plaintiff has described as bearing two central and significant differences from "mainstream" Christian traditions. Vincent Decl. Ex. 1, at 10 (doc. 93). First, ACI adherents believe that "any descendants of modern Europeans," and not followers of the Jewish faith, are the true descendants of the Israelites of the Old Testament, to whom all Biblical covenants exclusively apply. Forter Aff. of Rel. Convictions Ex. 5, at 8 (doc. 31).

This belief translates into a mandate that RAOE members be "genetic Israelite[s]," which, considering the RAOE's identification of Israelites as "Aryan" and "Sons of Light," means racially white. Forter Aff. of Rel. Convictions Ex. 11, at 18 (doc. 31); Forter Aff. of Rel. Convictions Ex. 12, at 14 (doc. 31). In fact, according to theological documents authored by plaintiff, the RAOE specifically sees "non-white primary races" (peoples of African or Asian descent) as the "beasts of the earth" mentioned in Genesis 1:25, whose God-given purpose is to serve as a "rod to chastise" white people. Forter Aff. of Rel. Convictions Ex. 10, at 10-11 (doc. 31) (internal quotations omitted).

Second, ACI adherents subscribe to what plaintiff has referred to as the "Seedline doctrine." Vincent Decl. Ex. 1, at 13 (doc. 93). The Seedline doctrine interprets the stories of

Genesis to say that the Jewish diaspora is "literally . . . the actual physical seed of the Devil." Id. at 13-14. These differences collectively amount to a consensus amongst the ACI "that the Jews have stolen [their] birthright as the chosen of God." Id. at 15. When asked about how violence against Jewish peoples "fit[s] into Christian Identity" in 2011, plaintiff responded that "it's a matter of personal choice." Id. at 27. Finally, when asked about historical persecution of Jewish peoples, plaintiff responded that "a lot of that persecution has to do specifically with them claiming to be the chosen people." Id. at 23.

Importantly, because the RAOE traces its roots back to the Biblical people of Israel, it mandates that members adhere to the dietary laws of the Old Testament. Pl.'s Concise Statement of Mat. Facts Ex. 3, at 33 (doc. 28). Unlike Jews and Muslims, however, RAOE members do not require their food to be blessed by a religious official because they subscribe to the protestant doctrine of the "priesthood of all believers." Id. Uniquely, the RAOE also holds that 1 Timothy 4:5 prohibits practices of vegetarianism and veganism. Id. The RAOE's prohibition of vegetarianism is the key doctrinal point for the purposes of this case.

## II. ODOC's Kosher Diet

ODOC's kosher diet is one of three dietary options available to inmates. Fanger Decl. ¶ 11 (doc. 94). The other options are the mainline fare, which includes the provision of meat and dairy, and the meat-alternative tray, which contains no meat and optional dairy components. Id.

The kosher diet consists of pre-packaged meals, supplemented with additional kosher menu items (some of which are also part of the mainline and meat-alternate trays). Id. at ¶ 12. The regular daily meals served as part of the kosher diet contain eggs, dairy, and soy products, but they do not contain meat. Id. at ¶ 4. As of 2020, meals served for each of the eight days of the Jewish holiday of Passover contain meat. Young Decl. ¶ 32 (doc. 95). Though not an official part of the kosher

diet accommodation, there are also multiple kosher meat products available for purchase in the canteen as well as through institutional chaplains. Id. at ¶ 30; Second Young Decl. ¶ 2 (doc. 108).

Plaintiff regularly purchased non-kosher meat and meatless items from the canteen prior to and during this lawsuit, but did not purchase any kosher meat items. Young Decl. Ex. 19 (doc. 95). Plaintiff maintains that he does not consume these non-kosher items. Pl.'s Reply Ex. J, at ¶¶ 6-7 (doc. 100-J).

**III. Plaintiff's Religious Diet Accommodation Request and Grievance**

Plaintiff submitted his first religious diet accommodation request on November 15, 2015. Young Decl. Ex. 3, at 2-3 (doc. 95). In response, Young directed plaintiff to his institution's chaplain so that he could complete a kosher diet agreement. Young Decl. Ex. 4, at 1 (doc. 95). Plaintiff completed that agreement on April 20, 2016. Young Decl. Ex. 5 (doc. 95). On July 11, 2016, plaintiff sent Young a letter stating, "vegetarianism is [f]orbidden in [his] faith" and that he was "dismayed to find out that the 'kashruth kosher' diet as offered here in O.D.O.C. is totally vegetarian." Young Decl. Ex. 6, at 3 (doc. 95).

On August 8, 2016, Young denied plaintiff's informal request that meat be added to the kosher diet program, explaining that "[t]he DOC provides a Kosher Diet meal that meets daily nutritional standards and there is a kosher meat item [in the] canteen which is available to you for purchase to exercise your religious belief." Compl. Ex. A, at 1 (doc. 2).

On August 16, 2016, plaintiff filed grievance TRCI-2016-08-113, challenging Young's decision and stating the kosher diet "forces [him] to engage in 'vegetarianism' which is a pagan practice. (1 Timothy 4:3)." Id. at 2. Young responded to the grievance on September 21, 2016, as follows:

> *"The spirit clearly says that in later times some will abandon the faith and follow deceiving spirits and things taught by demons. Such teachings come through*

> *hypocritical liars, whose consciences have been seared as with a hot iron. They forbid people to marry and order them to abstain from certain foods, which God created to be received with thanksgiving by those who believe and who know the truth. For everything God created is good, and nothing is to be rejected if it is received with thanksgiving, because it is consecrated by the word of God and prayer."* 1 Timothy 4:1-4[.]
>
> The verse you quoted warns believers to avoid the "liars" that tell them to abstain from certain foods and from marriage. Paul is saying the food and marriage are good and should not be avoided, he is not telling anyone what food to eat; that's an individual choice. He is simply telling them not to listen to religious "hypocrites" who require abstinence from food and marriage.
>
> There is nothing in these verses that tell you that you have to eat meat or that you have to abstain from meat – these verses emphasize your freedom to make your own choices and the freedom to ignore religious "liars" who command you not to eat certain foods.
>
> This is reemphasized in Galatians 5:1 – *"It is for freedom that Christ has set us free. Stand firm, then, and do not let ourselves be burdened again by a yoke of (religious) slavery*[.]*"*
>
> If you still feel you must eat meat as a personal choice, then as stated in our previous correspondence, you can purchase the meats of your choice on commissary and still partake of the kosher diet.

Id. at 3.

Plaintiff filed a grievance appeal reiterating that CJCC teaches that vegetarianism is a pagan practice and requesting that correction officials "make available the [kosher] meat entrees available from the 'meal mart' vendor." Compl. Ex. B, at 1-3 (doc. 2). Holmes denied the appeal. Id. at 4. Plaintiff filed a second appeal that Stewart denied as follows:

> [T]he Department of Corrections does provide a Kosher Diet meal that meets the daily nutritional standards, and if you choose to consume meat as well, there is a kosher meat item on canteen available to you for purchase.
>
> For those whose primary concern is to avoid eating foods identified in the Old Testament as unclean, DOC makes available a non-meat alternative diet which includes fresh and cooked fruits and vegetables. DOC's non-meat alternative meets all Old Testament dietary law requirements. The food is prepared and served in a manner that avoids contact with pork and other unclean foods. Additionally, inmates may "self-select" any meat on the menu making it possible to avoid a meal

> containing pork products or shellfish. This allows inmates to enjoy the meals offered which do not contain unclean items without having to always eat the vegetable meal.

Compl. Ex. C, at 1-2 (doc. 2). The administrative review process was concluded on February 6, 2017.

**IV. Proceedings Before This Court**

Plaintiff initiated this lawsuit on June 29, 2018, bringing three claims for relief. Compl. ¶¶ 6-7 (doc. 2). First, plaintiff alleges that Young and Holmes violated the Establishment Clause of the First Amendment by relying on "a classic Judeo-Christian interpretation of the Bible's Book of 1 Timothy 4:1-4" as the basis for denying his religious diet request. Id. Second, plaintiff alleges that defendants violated his First Amendment right to freely exercise his religious beliefs by refusing "to accommodate his request for a religious diet which is a central tenet of his faith." Id. at ¶ 8. Third, plaintiff alleges that defendants violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA") due to the aforementioned acts. Id. Plaintiff seeks a declaratory judgment, money damages, and an injunction "permanently enjoining [d]efendants and their agents and employees from subjecting [p]laintiff to the conduct of the type and degree alleged." Id.

On February 1, 2019, plaintiff filed the present motion for summary judgment, solely as to his RLUIPA claim. On November 8, 2019, defendants filed a cross-motion for summary judgment as to all claims.

**STANDARD OF REVIEW**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

Defendants assert that no disputed issue of material fact exists, such that summary judgment is appropriate, because ODOC's largely vegetarian kosher diet neither constitutes a substantial burden on plaintiff's ability to freely exercise his religious beliefs, nor does the denial of his accommodation request amount to condoning or disapproving his religious beliefs. Conversely, plaintiff contends that defendants could accommodate his request for a meat inclusive kosher diet with no cost increase and that their refusal to do so substantially burdens his ability to freely exercise his beliefs in violation of the RLUIPA. Plaintiff further asserts that qualified immunity should not shield defendants from liability for damages.

### I. RLUIPA Claim

To successfully bring a claim under the RLUIPA, a plaintiff must identify the religious exercise allegedly infringed upon and illustrate how the prison regulation in question substantially burdens that free exercise. Greene v. Solano Cty. Jail, 513 F.3d 982, 987 (9th Cir. 2008). A substantial burden on religious exercise must impose a significant onus, meaning that the regulation puts substantial pressure on a religious adherent to modify his behavior and violate his beliefs. Warsoldier v. Woodford, 418 F.3d 989, 995 (9th Cir. 2005) (citations omitted).

If a plaintiff successfully shows a substantial burden, the defendants must show that the regulation in question furthers a compelling government interest and does so by the least restrictive means. Greene, 513 F.3d at 988 (citations omitted). To show that the means employed are the least restrictive, the defendants must demonstrate that they considered and rejected the efficacy of less restrictive measures before adopting the challenged practice. Warsoldier, 418 F.3d at 996.

Here, plaintiff has failed to show that ODOC's kosher diet substantially burdens his ability to freely exercise his religious belief prohibiting vegetarianism. First, the kosher diet provided by ODOC is not, in fact, entirely vegetarian. Young Decl. ¶ 31 (doc. 95). Namely, there is an eight-day period each year during which plaintiff is provided with kosher meat meals. Id.

Second, plaintiff has access to kosher meat items on a daily basis through the canteen and institutional chaplain. Young Decl. ¶ 30 (doc. 95); Second Young Decl. ¶ 2 (doc. 108). Plaintiff nonetheless did not purchase kosher meat once between January 2018 and November 2019. Young Decl. ¶ 31 (doc. 95); Young Decl. Ex. 19 (doc. 95). Instead, plaintiff regularly purchased non-kosher items from the canteen prior to and during this lawsuit. Id. This shows that any onus he bears regarding his diet does not put substantial pressure on him to modify his behavior. Though plaintiff asserts he does not consume the non-kosher items he purchases, the undisputed fact that plaintiff has allocated his personal funds towards nearly 400 non-kosher items, instead of one

kosher meat item, establishes that he is capable of fulfilling his religious dietary needs without a substantial burden placed on his free exercise of religion.

Even assuming plaintiff could demonstrate a substantial burden, his RLUIPA claim still fails because defendants have successfully shown that ODOC's provision of the largely vegetarian kosher diet, and its rejection of plaintiff's request to amend that diet, furthers a compelling government interest in budgetary and operational efficiency by the least restrictive means. Budgetary and operational efficiency is a well-established compelling government interest. See Cutter v. Wilkinson, 544 U.S. 709, 721 (2005) (maintaining "good order, security and discipline, consistent with consideration of costs and limited resources," is a compelling government interest).

Moreover, defendants have considered, but rejected, the efficacy of less restrictive measures in their formulation of the current kosher diet policy. Fanger Decl. ¶¶ 6-10 (doc. 94). ODOC approaches every religious diet request with a "strong desire to accommodate the request." Young Decl. ¶¶ 5, 8 (doc. 95). However, the "only means [ODOC has] to determine how to accommodate an AIC's religious practice is to research the religious practice, consult with religious authorities, and determine how to meet the AIC's beliefs"; if ODOC is "unable to rely on this information and advice, [it] would have to comply with every request," which would, in-and-of-itself, create additional problems. Id. at ¶¶ 8-9.

Further, specific to the kosher diet program, ODOC has historically had difficulty maintaining the program so that it complies with religious and sanitary practices. Fanger Decl. ¶¶ 3-6 (doc. 94). ODOC previously had kosher preparation areas in each institution which "involved procuring some kosher items and storing them separately, preparing vegetables in a separate room or separate area of the kitchen, and ensuring that the pots used to cook beans and rice for the kosher diet maintained their kosher status." Fanger Decl. ¶ 3 (doc. 94). However, ODOC moved away

from the kosher preparation area alternative because it was cost prohibitive and difficult to maintain due to the ease with which the cookware and utensils used to prepare kosher meals can become contaminated, particularly due to prisoners' intentional or inadvertent actions, some of which involved introduction of meat into the preparation area. Id. at ¶¶ 3-6. The next option ODOC considered was opening a central kosher production kitchen at one of its larger institutions. Id. at ¶ 9. However, ODOC rejected this alternative as well because it was cost prohibitive and would have presented "many of the same challenges that ODOC faced when operating a kosher preparation area in each institution." Id.

After rejecting kosher preparation areas and a central kosher kitchen, ODOC ultimately implemented the policy by which it would serve pre-packaged kosher entrees from a private vendor. Id. at ¶¶ 7-8. ODOC made this choice to avoid concerns about contamination while still providing a "kosher compliant, nutritionally balanced diet in a cost-effective manner that satisfied the needs of the AICs." Id. at ¶ 7. Considering the range of factors taken into account by ODOC in formulating the kosher diet policy, coupled with the sensitive nature of providing that diet, ODOC's denial of plaintiff's request to introduce meat into its daily kosher meals is the least restrictive means by which ODOC can further its compelling government interest in providing its kosher diet in a cost effective and operationally efficient manner.

Finally, even if plaintiff could demonstrate a violation of the RLUIPA, for the reasons discussed below, defendants would be entitled to qualified immunity from damages to the extent plaintiff's claim is brought against them in their individual capacities. See Shilling v. Crawford, 377 Fed. Appx. 702, 705 (9th Cir. 2010) (qualified immunity attaches to RLUIPA claims brought against prison officials in their individual capacities). Plaintiff's motion is denied and defendants' motion is granted as to plaintiff's RLUIPA claim.

## II. Section 1983 Claims

Government officials who, through actions or policies taken under the color of state law, deprive a person of "any rights, privileges, or immunities secured by the Constitution and laws" can be liable to the injured party for damages and injunctive relief. 42 U.S.C. § 1983. A government official being sued under § 1983 is protected by qualified immunity for damages from an allegedly unlawful action unless he acted in a way that a reasonable official would understand violates a clearly established right. Anderson v. Creighton, 483 U.S. 635, 638-39 (1987) (citing Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). To determine whether qualified immunity applies, the court must evaluate whether the alleged action amounts to a violation of a constitutional right and whether the right was clearly established at the time of the violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). The Court has discretion to employ each part of the test in the manner it finds most efficient. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

### A. Free Exercise Clause Claim

To succeed on a claim under the Free Exercise Clause, a plaintiff must show that a government action imposes a substantial burden on his free exercise of a sincerely-held religious belief. Shakur v. Schriro, 514 F.3d 878, 884 (9th Cir. 2008). When the claim is brought by an inmate challenging a prison regulation, the regulation may be valid even if it does infringe upon a sincerely-held religious belief, but only if the regulation is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987).

To determine whether an infringing practice is reasonably related to a legitimate penological interest, the court must balance the following factors: (1) whether there is a "valid, rational connection" between the regulation and the legitimate interest in question, (2) whether alternative means of freely exercising the religious belief are available to the inmate, (3) the effect

that accommodation, if granted, would have on the prison community and the allocation of prison resources, and (4) the presence of "ready alternatives" that the prison could use to fully accommodate the inmate's rights at de minimis cost to valid penological interests. Id. at 89-90. Though a government policy "cannot be sustained" if it fails the first factor of the Turner test, the court must otherwise analyze each factor given the totality of the circumstances. Id.

As a preliminary matter, evaluating the sincerity of a religious belief "is a question of fact, generally not appropriately decided in a motion for summary judgment." Shilling v. Crawford, 2007 WL 2790623, at *16 (D. Nev. Sept. 21 2007); see also Monts v. Arpaio, 2012 WL 160246, at *3 (D. Ariz. Jan. 19, 2012) (although the plaintiff presented a "weak" case for the sincerity of his religious belief, a question of fact existed such that summary judgment on this issue was inappropriate); Wise v. Skrah, et. al, Case No. 1:15-cv-01731-PK, Findings & Recommendations (Feb. 10, 2017) (collecting cases illustrating how evaluating the sincerity of a religious belief involves questions of fact that preclude summary judgment). Nevertheless, plaintiff has failed to show that his sincerely-held religious belief regarding the impropriety of vegetarianism has been substantially burdened by the ODOC kosher diet's largely vegetarian nature for the same reasons as stated above in regard to his RLUIPA claim.

The Turner test also weighs against plaintiff's Free Exercise Clause claim. First, maintaining budgetary and operational efficiency in the provision of dietary policies constitutes a legitimate penological interest. Cotton v. Cate, 578 Fed. Appx. 712, 714 (9th Cir 2014) ("[P]rison officials have a legitimate penological interest in maintaining a simple food service.").[2] ODOC's

[2] Additionally, when dealing with religious groups like the Aryan Nation and CJCC, courts "may be expected to recognize the government's countervailing compelling interest in not facilitating inflammatory racist activity that could imperil prison security and order." Cutter, 544 U.S. at 723 n.11.

practices surrounding its kosher diet program and its denial of plaintiff's request to implement a new kosher diet that includes daily meat entrees are reasonably related to that legitimate penological interest, as shown by the extensive and unrefuted evidence submitted by defendants. See, e.g., Fanger Decl. ¶¶ 6-11, 37-39 (doc. 94); see also Cotton, 578 Fed. Appx. at 714 ("[d]enying [the plaintiff's] request to create and serve a new meal plan is rationally related to" the prison's legitimate penological interest in maintaining a simple food service).

Second, alternative means of free exercise regarding plaintiff's religious diet are readily available – i.e., plaintiff can purchase kosher meats from the canteen and prison chaplains, and ODOC serves kosher meat dishes during the eight days of Passover. Young Decl. ¶ 31 (doc. 95); Second Young Decl. ¶ 2 (doc. 108). Third, ODOC has submitted unrefuted evidence showing that the provision of the kosher diet is a sensitive and costly process, particularly because inmates have historically been mistrustful of the high capacity for contamination of cookware and utensils used in kosher food preparation, and is thus vulnerable to disruption by accommodations like those plaintiff has requested. See Fanger Decl. ¶¶ 5-6, 37-39 (doc. 94) (noting ODOC's history of difficulty maintaining meat-alternative kosher diets as well as the significant additional cost to ODOC per kosher diet participant).

Plaintiff nonetheless broadly concludes that ODOC can accommodate his request and, in fact, save money, by replacing the soy products currently served in the kosher entrees with kosher meat items from the same vendor. Pl.'s Reply 16, 47 (doc. 100). Plaintiff, however, has not submitted any evidence in support of this assertion, such that no disputed issue of material fact exists regarding this issue. See Celotex, 477 U.S. at 322 (summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden on proof at trial"). This

is especially true considering defendants' substantial evidence as to the current cost and sensitivity of the kosher diet program.

Fourth, as is shown by ODOC exploring and rejecting alternative means of providing a kosher diet before deciding to proceed with its current model, there is no obvious or ready alternative to accommodating plaintiff's dietary request at de minimis cost to ODOC's valid penological interests. Fanger Decl. ¶¶ 5, 7-10, 13, 19, 36-40 (doc. 94); see also Defs.' Mot. Summ. J. 13 (doc. 92) ("There are no alternatives, let alone 'obvious' and 'easy' ones that could comport with defendants' security and budgetary concerns at de minimis cost."). As various courts have recognized, the particular beliefs of the CJCC can pose unique security concerns in the prison context. See Anderson v. U.S. Bureau of Prisons, 1992 WL 97814, at *1 (D. Or. Apr. 17, 1992) (CJCC "practices are disruptive to the orderly running of the institution"); see also Young Decl. ¶¶ 8-9 (doc. 95) ("ODOC's prison population is an extremely insular group [such that if] one AIC is successful in requesting an item, we are often flooded with similar requests from inmates who do not necessarily share the [same] religious beliefs," which can create tension within the prison population).

In sum, even if the record did show a substantial burden on plaintiff's sincerely-held religious beliefs, which it does not, ODOC has successfully shown that its policy of serving largely vegetarian kosher entrees is reasonably related to legitimate penological interests in operational and budgetary efficiency, and in maintaining security and order. Defendants' motion is granted as to plaintiff's Free Exercise Clause claim.

**B. Establishment Clause Claim**

Plaintiff's Establishment Clause claim turns on one citation within the grievance response issued by Young on September 21, 2016. Specifically, plaintiff takes umbrage with what he sees

as Young "using contrary religious doctrine of one denomination to deny a request of a person of a different denomination." Pl.'s Reply 26 (doc. 100).

Plaintiff's claim is novel as it relates to the Establishment Clause. Establishment Clause claims involving religious diet accommodations are more frequently brought as challenges to dietary policies as a whole. See, e.g., Robinson v. Cate, 2015 WL 5326199, at *18 (E.D. Cal. Feb. 5, 2014). Indeed, plaintiff has not cited to, and the Court is not aware of, any authority that has held a response within a grievance process, in and of itself, to violate the Establishment Clause. Moreover, courts in the Ninth Circuit routinely dismiss Establishment Clause claims challenging denials of religious diet requests on Fed. R. Civ. P. 12(b)(6) grounds. See Burton v. Clark, 2009 WL 3254897, at *2-3 (E.D. Cal. Oct. 8, 2009) (the plaintiff's claim challenging a denial of his religious diet request was "better encompassed by the Free Exercise Clause as opposed to the Establishment Clause"). Nonetheless, the Court proceeds to evaluate plaintiff's claim on its merits for the purposes of defendants' motion for summary judgment.

The Establishment Clause "prohibits the enactment of a law or official policy that establishes a religion or religious faith, or tends to do so." Newdow v. Lefevre, 598 F.3d 638, 643 (9th Cir. 2010). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982). Historically, to evaluate a claim under the Establishment Clause of the First Amendment, courts have used the test articulated in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). To survive an Establishment Clause challenge, the Lemon test requires that government acts: (1) have a secular purpose, (2) not have a "principal or primary effect" which either "advances [or] inhibits religion," and (3) not foster "an excessive government entanglement" with religion. Id.

In the years following Lemon, however, courts have criticized, refined, and provided context-specific alternatives. See Lee v. Weisman, 505 U.S. 577, 586-87 (1992) (declining to apply the Lemon test in a case involving prayer in public schools); Am. Legion v. Am. Humanist Ass'n, 139 S.Ct. 2067, 2081-82 (2019) (counseling against using the Lemon test in cases focused on religious expression or symbols in public monuments or displays). Foremost amongst those alternatives are the endorsement and coercion tests, which, respectively, bar government action that has the primary effect of officially endorsing a religion or coercing a person into practicing religion. Lynch v. Donnelly, 465 U.S. 668, 687-94 (1984) (O'Connor, J., concurring); Cty. of Alleghany v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 629 (1989) (Kennedy, J., concurring). Despite its checkered history, though, the Ninth Circuit continues to rely predominantly on the Lemon test to evaluate claimed violations of the Establishment Clause. See Inouye v. Kemna, 504 F.3d 705, 712 n.7 (2007) ("The basic test for Establishment Clause violations remains that articulated in Lemon v. Kurtzman.").

Plaintiff has raised the prospect of applying each of the three tests. Pl.'s Reply 23-34 (doc. 100). Regardless of which test the Court applies, however, plaintiff's Establishment Clause claim fails because Young's response had a secular purpose and did not have the primary effect of endorsing a religious view, coercing plaintiff into practicing religion, or otherwise discriminating against plaintiff's religious tradition.

First, Young's response had a secular purpose in responding to plaintiff's requests in an efficient and meaningful manner within the grievance process. See Kreisner v. City of San Diego, 1 F.3d 775, 782 (9th Cir. 1993) (government action will fail based on its purpose "only if it is motivated *wholly* by an impermissible purpose"). Specifically, defendants reiterated that plaintiff could "purchase the meats of [his] choice on commissary and still partake of the kosher diet."

Young Decl. Ex. 13 (doc. 95). The secular administrative functions of the grievance process in general are clear and beyond dispute.

Second, the primary effect of the responses was not to endorse a particular dogma, or otherwise advance or inhibit religion, but to address plaintiff's religious diet request. See Epps v. Grannis, 2011 WL 7629006, at *7-8 (S.D. Cal. Dec. 1, 2011), rev'd on other grounds, 2012 WL 1032344 (S.D. Cal. Mar. 11, 2012). ("[T]he provision of kosher meals . . . simply seeks to alleviate a government created-burden on religious exercise."). Furthermore, plaintiff has failed to show the content of Young's response coerced him into adjusting his religious exercise. See El-Shaddai v. Stainer, 2016 WL 7261230, at *11 (C.D. Cal. Dec. 13, 2016) (dismissing the plaintiff's claim that denial of his request for religious services violated the Establishment Clause because he failed to show any coercive effect); see also Young Decl. Ex. 19 (doc. 95) (detailing plaintiff's purchases of non-kosher items).

In particular, Young's citation to Galatians 5:1 does not evince official endorsement of any religion or discrimination against plaintiff's beliefs. See Newdow v. Rio Linda Union Sch. Dist., 597 F.3d 1007, 1037 (9th Cir. 2010) (mandates to say the pledge of allegiance in public schools do not constitute endorsement, despite the presence of the word "God" in the pledge); see also Epps, 2011 WL 7629006 at *7-8 (dismissing a claim that prison officials violated the Establishment Clause by denying a kosher diet request because no discrimination was evident and plaintiff acknowledged that there were alternatives available that met his religious requirements). Instead, Young's citation to Galatians 5:1 shows his efforts to address plaintiff's concerns meaningfully and directly, as the RAOE holds as sacred the New Testament canon, including Galatians. See Forter Aff. of Rel. Convictions Ex. 10, at 4 (doc. 31) (stating that the RAOE adhere to a scriptural canon composed of "the Hebrew Old Testament, [the] Greek New Testament[,] and

[the] Dead Sea Scrolls"). In other words, the effect of Young's response was not to force external dogma upon plaintiff, but to meet plaintiff on his own terms. There is nothing contained in Young's response that suggests his interpretation came from any religion in particular or otherwise endorsed a religious view in a manner that amounted to "one religious denomination . . . [being] officially preferred over another." Larson, 456 U.S. at 244.

Finally, prison officials do not have to accommodate every interpretation of religious text or history that inmates assert. See El-Shaddai, 2016 WL 7261230 at *11 (dismissing the plaintiff's claim that denial of his request for religious services violated the Establishment Clause despite plaintiff's idiosyncratic understanding of Jewish doctrine and identity). As explained by Young in his response, 1 Timothy 4:3 does not plainly advocate consumption of one food over another or prescribe a specific diet. Compl. Ex. A, at 3 (doc. 2). Young's response is particularly understandable considering the unique inferential leaps requisite in the RAOE's doctrinal understanding of 1 Timothy 4:1-4, as well as plaintiff's authorship of the theological texts bolstering that understanding. See Forter Aff. of Rel. Convictions ¶ 8 (doc. 31) (stating that the RAOE's position on vegetarianism is "based upon deep exegetical study of 1 Timothy chapter 4 and its direct connection to Romans chapter 1"); Pl.'s Reply Ex. F, at 1, 10 (doc. 100) (same); Pl.'s Reply Ex. I, at 24[3] (doc. 100) (same).

Therefore, defendants' actions did not result in a violation of plaintiff's First Amendment rights. Furthermore, it would not have been clear to reasonable officials in defendants' positions that serving a largely kosher vegetarian diet or responding to plaintiff's grievance requests in the manner set forth above would violate the First Amendment. Accordingly, even if defendants had

---

[3] Because the pages to this attachment are not consecutively numbered, the Court refers to the page numbers assigned in the docket.

violated plaintiff's constitutional rights, qualified immunity would nonetheless attach to plaintiff's claim for damages. See Friedman v. South, 92 F.3d 989, 989 (9th Cir. 1996) (prison officials that denied a kosher diet request were entitled to qualified immunity).

**CONCLUSION**

For the reasons stated above, plaintiff's partial motion for summary judgment (doc. 27) is denied and defendants' motion for summary judgment (doc. 92) is granted. This case is dismissed.

IT IS SO ORDERED

DATED this 20th day of April, 2020.

/s/ Jolie A. Russo
JOLIE A. RUSSO
United Stated Magistrate Judge